1

2

3

4

5

6

7

8 # UNITED STATES DISTRICT COURT

9 ## EASTERN DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| LAURA JEAN HILL, | ) | Case No.: 1:11-cv-00582-SKO |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER REGARDING** |
| v. | ) | **PLAINTIFF'S COMPLAINT** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | (Docs. 13, 14) |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

18

19 ## INTRODUCTION

20     Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the

21 "Commissioner" or "Defendant") denying her application for supplemental security income ("SSI")

22 pursuant to Title XIV of the Social Security Act (the "Act"). 42 U.S.C. §§ 405(g); 1383(c)(3). The

23 matter is currently before the Court on the parties' briefs, which were submitted, without oral

24 argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

25

26

27

28     [1] The parties consented to the jurisdiction of the United States Magistrate Judge. (Docs. 7, 11.)

# FACTUAL BACKGROUND

Plaintiff was born in 1969, has a high school education, and has no past relevant work. (Administrative Record ("AR") 92, 197.)  On May 20, 2007, Plaintiff filed an application for SSI, alleging disability beginning on August 3, 1993, due to diabetes, high blood pressure, high cholesterol, bi-polar disorder, neuropathy in both feet and legs, sleep apnea, and restless leg syndrome.  (AR 166.)

## A.   Physical Health Medical History

Between November 2005 and February 2006, Plaintiff was examined by Eunice Baluyot, M.D., who diagnosed Plaintiff with urinary tract infections, uncontrolled diabetes, and high blood pressure.  (AR 516-18.)  In March 2006, Plaintiff presented at the Doctors Medical Center emergency room where she was diagnosed with eczema, hypertension, and hyperglycemia.  (AR 219-32.)  Plaintiff was treated by Dr. Baluyot between March 2006 and October 2007 for a variety of symptoms, including skin symptoms, pain on urination, and edema; Plaintiff was diagnosed with hyperlipidemia,[2] a heart murmur, uncontrolled hypertension, and diabetes mellitus.  (AR 219-39, 278-90, 302-15, 318-22.)

On December 12, 2006, Plaintiff was seen for complaints of numbness on the left side of her face and body; she was diagnosed with hypertension, diabetes, and left-sided paresthesia.  (AR 316.)  Plaintiff was treated by Dr. Baluyot between November 2007 and April 2009, and was again diagnosed with diabetes mellitus under poor control, a urinary tract infection, hypertension, hyperlipidemia, and depression.  (AR 299-301, 427-66, 545-52.)

On October 31, 2007, Plaintiff was examined by Tri Minh Pham, M.D.  (AR 248-50.)  Plaintiff presented with complaints of pain in her legs and feet, diabetes mellitus, and hypertension.  (AR 248.)  Upon examination, Dr. Pham noted that Plaintiff presented a history of leg pain radiating to her feet with no evidence of injury, no sensory deficit, and no limitation of range of motion.  (AR 249.)  Dr. Pham determined that Plaintiff could walk, stand, sit, carry, lift and handle objects with no restrictions.  (AR 249.)  Although Plaintiff had adult-onset diabetes mellitus, it was controlled

---

[2] Hyperlipidemia is "a general term for elevated concentrations of any or all of the lipids in the plasma." *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 903 (31st ed. 2007) (defining "hyperlipidemia.")

with oral medications and there was no evidence of neuropathy or end organ damage.  (AR 249.)

Although Plaintiff was hypertensive, the problem was controlled with medication.  (AR 249.)

In January 2008, Plaintiff reported numbness and tingling, worse on the right side of her body.  (AR 299.)  On May 16, 2008, Plaintiff was seen for complaints of stomach and abdominal pain, and she was diagnosed with hematuria.[3]  (AR 449.)  On October 10, 2008, Plaintiff underwent an abdominal hysterectomy, and was diagnosed with chronic menorrhagia,[4] chronic pelvic pain, uterine myomas,[5] type II diabetes mellitus, and chronic hypertension.  (AR 421-26.)

On April 21, 2009, Dr. Baluyot wrote a request that Plaintiff's son be moved to a prison that was located closer to Plaintiff because of her medical conditions:

> We'd like to request for Laura's son to be sent to a nearby prison if possible.  Patient suffers from multiple health problems and can't tolerate traveling for several hours to visit her son in jail.

(AR 431.)  On April 23, 2009, Dr. Baluyot wrote a letter addressed "to whom it may concern," stating that Plaintiff was receiving medication for the following conditions/indications:  peripheral neuropathy, diabetes, depression, anxiety, insomnia, GERD, back, feet and leg pain, and restless leg syndrome.  (AR 430.)

On May 7, 2009, Plaintiff was examined by Dr. Levin who noted that Plaintiff was diabetic and had worsening paresthesias in her lower extremities.  (AR 579.)  Dr. Levine reported that Plaintiff was morbidly obese, that Plaintiff's cranial nerves II through XII were intact, and that Plaintiff "ha[d] a stocking glove distribution neuropathy to light touch, vibration, and pinprick."  (AR 579.)  Dr. Levin reported that Plaintiff had no pain with straight-leg raising in her lower extremities, and she was able to heel, toe, and tandem gait without difficulties.  (AR 579.)  Dr. Levine noted Plaintiff had color changes and coldness in her hands and feet; he administered an electromyogram

---

[3] Hematuria is defined as blood in the urine.  *Dorland's* 844 (31st ed. 2007).

[4] Menorrhagia is abnormally heavy and prolonged menstrual bleeding.  *Dorland's* 1152 (31st ed. 2007).

[5] Myomas are benign tumors.  *Dorland's* 1242 (31st ed. 2007).

('EMG') test and determined that Plaintiff suffered from polyneuropathy,[6] most likely related to diabetes. (AR 579.)

On November 4, 2009, Dr. Levine wrote a letter to Dr. Baluyot relating to Plaintiff's condition:

> Ms. Hill has been followed by myself prior to this on 05/07/09. She has been diagnosed with diabetic polyneuropathy. She appears to have a progression of her symptomatologies. She has severe pain, burning dysesthesias,[7] and dysautonomia.[8] She is treating with Dr. James Kraus and receiving numerous medications to treat her pain and dysesthesias  Recently over the last few months she has also been treated for restless legs symptomatology, same as patients with progressive diabetic neuropathy.  It appears that the treatment for neuropathy is somewhat disabling for her [as it] inhibits her from completing her activities of daily living on her own.

(AR 581.)

**B.      Mental Health Medical History**

On October 6, 2007, Plaintiff was examined by James Scaramozzino, Ph.D. (AR 241-47.) At the examination, Plaintiff's chief complaints included episodes of not needing any sleep for two to three days at a time, and then becoming withdrawn, depressed, and isolated. (AR 241.)  She reported becoming easily fatigued and being depressed most of the day. (AR 241.) Plaintiff reported that she first suffered depression in 1994 when her mother died. (AR 241-42.) Since 2002, Plaintiff had become more depressed and was unable to do things that she had done in the past, including involvement in multiple sports supervisory activities and driving her children to different activities. (AR 242.)

Dr. Scaramozzino described Plaintiff as being overweight, but noted that Plaintiff reported walking every night and had lost 20 pounds in the last year. (AR 243.) Dr. Scaramozzino described Plaintiff's attitude as "pleasant and frightened at the same time." (AR 243.)  Plaintiff's mood was deemed depressed, and her affect was "consistent with the information provided." (AR 244.)  Dr.

---

[6] Neuropathy is a functional disturbance or pathological change in the peripheral nervous system. Polyneuropathy is neuropathy of several peripheral nerves simultaneously. *Dorland's* 1287, 1513 (31st ed. 2007).

[7] Dysesthesia is the distortion of any sense, especially that of touch. *Dorland's* 584 (31st ed. 2007).

[8] Dysautonomia is defined as the "malfunction of the autonomic nervous system. *Dorland's* 583 (31st ed. 2007).

Scaramozzino found that Plaintiff's stream of mental activity was within normal limits; her thought content was appropriate; her intellectual functioning was within the average range; and her concentration ability, abstracting thinking, and judgment and insight were within normal limits. (AR 245.)

Dr. Scaramozzino diagnosed Plaintiff with bipolar II disorder, and assigned her a Global Assessment of Functioning ("GAF") score of 50.[9] (AR 245.) Dr. Scaramozzino noted that Plaintiff appeared to respond to questions in an open and honest manner, there was no evidence that she was exaggerating her symptoms, and there were no apparent inconsistencies throughout the evaluation. (AR 245.) Dr. Scaramozzino opined that Plaintiff's ability to understand and remember very short and simple instructions or detailed instructions was fair to poor; Plaintiff's ability to accept instructions from a supervisor and respond appropriately was poor and primarily influenced by her depressive symptoms which were noted to be frequent; Plaintiff's ability to sustain an ordinary routine without special supervision was "fair"; Plaintiff's ability to complete a normal workday/workweek without interruptions at a constant pace was deemed "fair to poor due to the uncontrolled cycles that she continues to go through between depression and hypomania"; Plaintiff's ability to interact with co-workers and deal with various changes in a work setting was deemed to be "fair to poor"; and Plaintiff's likelihood of emotionally deteriorating in the work environment was considered "fair to high." (AR 246-47.)

On November 2, 2007, state-agency consulting psychiatrist Archimedes R. Garcia, M.D., completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique Form. (AR 251-64.) Other than finding Plaintiff moderately limited in her ability to understand and remember detailed instructions, Dr. Garcia reported that Plaintiff was "not significantly limited" in all other areas of sustained concentration and persistence, social interaction, or adaptation. (AR 251-

---

[9] The GAF score is a tool for "reporting the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 2000). The clinician uses a scale of zero to 100 to consider "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations. *Id.* at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)."

52.) In rating Plaintiff's degree of functional limitation, Dr. Garcia concluded that Plaintiff had only mild restriction in activities of daily living, social functioning, and maintaining persistence, concentration, and pace. (AR 262.) He also noted that there was insufficient evidence of any episodes of decompensation of an extended duration. (AR 262.)

On May 14, 2008, state-agency consulting physician Evangeline A. Murillo, M.D., reviewed Plaintiff's medical records and affirmed Dr. Garcia's assessment finding that Plaintiff retained the mental residual functional capacity to perform simple, repetitive tasks. (AR 326-27.)

Plaintiff completed a depression questionnaire on May 21, 2008. (AR 440.) The questionnaire recorded how often, over the course of the two weeks prior to completing the form, the subject completing the form was bothered by certain symptoms. (AR 440.) Plaintiff indicated that on more than half of the days in the two weeks prior to May 21, 2008, she felt little interest or pleasure in doing things; she felt down, depressed or hopeless; she had trouble falling or staying asleep or slept too much; she felt tired or had little energy; she felt bad about herself or that she was a failure or let herself or her family down; and she had trouble concentrating on things such as reading the newspaper or watching television. (AR 440.) For at least several days over the course of the two weeks prior to May 21, 2008, Plaintiff checked the box indicating that she was either speaking so slowly that others noticed or she was so fidgety and restless that she was moving around more than usual, and she had thoughts that she would be better off dead or of hurting herself in some way. (AR 440.) The questionnaire also requested that the subject indicate how difficult these problems made it to perform work, take care of things at home, or get along with other people. (AR 440.) On a four point continuum from "not difficult at all" to "extremely difficult," Plaintiff indicated that her problems made it "very difficult" for her to complete her work. (AR 440.)

On June 2, 2009, Lawrence M. Ruiz, a Licensed Clinical Social Worker at Golden Valley Health Centers ("Golden Valley"), submitted a letter regarding Plaintiff, who has been a patient at Golden Valley since April 2007. (AR 580.) He listed his diagnostic impressions of Plaintiff as bipolar disorder II and post traumatic stress disorder ("PTSD"). (AR 580.) He indicated that Plaintiff's condition "is improving as of late but with this disorder it is too soon to know how she will do over the long run." (AR 580.) He noted that bipolar disorder is hereditary and requires treatment

over the lifetime of the patient.  (AR 580.)  Mr. Ruiz reported that Plaintiff had attended five sessions as of the date of his letter, and had also attended several sessions with a different therapist at Golden Valley.  (AR 580.)

**B.      Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 125-33.)  On May 11, 2009, ALJ Sandra Rogers held a hearing where Plaintiff testified through the assistance of counsel.  (AR 95-112.)

**1.      Plaintiff's Testimony**

Plaintiff testified that her most significant difficulty was the pain she experiences in her feet and legs as well as her depression.  (AR 98.)  The pain in her legs is due to her diabetes, and she also experiences numbness and tingling "all the time."  (AR 99.)  Plaintiff experiences worsening pain when she walks, sits, or stands for long periods of time.  (AR 99.)  She needs to change positions frequently; she can stand for only 10 to 15 minutes before she must sit.  (AR 99.)  Her legs shake involuntarily, which causes pain and fatigue.  (AR 100.)

Plaintiff reported that she is depressed and she cries all the time.  (AR 101.)  She sleeps a lot, and lies down about four times a day to sleep for approximately an hour each time.  (AR 101.)  She takes medication for her sleep issues as well as for her depression.  (AR 101-02.)  Plaintiff testified that she has difficulty thinking and remembering things, and she has to write everything down.  She has carpal tunnel syndrome that causes her to drop things.  (AR 102-03.)  Her hands go numb frequently, and as a result, Plaintiff burns herself.  Plaintiff was involved in a car accident many years before the hearing.  As a result, her left shoulder was injured, she is unable to lift the shoulder, and she cannot sleep on her left side.  (AR 103.)

Plaintiff reported that she is not reliable because "it takes a lot to get her where she needs to go."  (AR 104.)  She cleans when she can, but her teenage children help her.  (AR 104.)  She is tired all the time, so cooking requires a lot of work.  (AR 105.)  She has been treated by psychiatrists for her depression, and her diagnosis has shifted from depression to manic disorder and bipolar.  (AR 106.)  Plaintiff sees a counselor once every one to two weeks.  (AR 106.)  Plaintiff's physician told

her that her neuropathy in her legs was "bad," but that she should walk to help the circulation to her legs even though the walking causes pain. (AR 106-07.) Plaintiff also suffers from irritable bowel syndrome ("IBS"), for which she is being treated. (AR 107.) She reported that she had lost 30 pounds since December 2006 due to IBS. (AR 108.) If she pushes herself physically on a particular day she suffers an "episode," where she feels as though she is going to vomit, she gets sweaty, and she has to sleep:

> I get all sweaty and I have to sleep. I just lay down and sleep. I don't know how to explain it. I know what it felt like on an airplane because that's when I had my first one, but I had one when I was at home. And my blood sugar went up to 395 and then it dropped down to 70. It seems like I'm only out for a few seconds. I don't know how long. And I go in every time I have one and they check me and I'm okay.

(AR 108-09.) Plaintiff predicted that, after she left the hearing, she would be sick for three to four days and would experience nausea and fatigue due to the exertion. (AR 105.)

### 2. Vocation Expert Testimony

Vocational Expert ("VE") David Dettmer also testified at the hearing. (AR 109-11.) The ALJ posed a hypothetical to the VE which assumed a person of the same age, education, and work experience as Plaintiff and who was limited to sedentary work. (AR 109.) The VE testified that such an individual would be able to perform work in jobs such as small parts assembly, telephone survey worker, and office helper. (AR 109-10.)

### 3. ALJ Decision

On October 23, 2009, the ALJ issued a decision, finding Plaintiff not disabled since May 20, 2007, through the date of decision. (AR 84-94.) The ALJ found that Plaintiff had the following severe impairments: diabetes mellitus with mild polyneuropathy, bipolar disorder, and PTSD. (AR 86.) Based on these severe conditions, in combination with the functional effects of Plaintiff's non-severe impairments, the ALJ determined Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work limited to simple, repetitive, routine tasks. (AR 88.)[10]

---

[10] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"

The ALJ found that Plaintiff had no past relevant work, but, based on testimony from the VE, Plaintiff could perform work as a small parts assembler, telephone survey worker, and office helper. (AR 93.) The ALJ concluded that Plaintiff was not disabled since May 20, 2007, the date Plaintiff's application for SSI was filed. (AR 94.)

Plaintiff sought review of this decision before the Appeals Council. (AR 1-3.) On February 14, 2011, the Appeals Council denied review. (AR 41-44.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 416.1481.

## C. Plaintiff's Contentions on Appeal

Plaintiff argues that the ALJ erred by failing to include all of Plaintiff's limitations in the hypothetical question posed to the VE; failing to address Plaintiff's insomnia impairment and the resulting symptom of fatigue; and in weighing the medical evidence. (Doc. 13-1.) Plaintiff also contends that she submitted new and material evidence to the Appeals Council and the case should be remanded so that the ALJ can consider the new and material evidence. (Doc. 13-1, 17-19.)

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both

*Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c).   If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work.   *Id.* §§ 404.1520(f), 416.920(f).   If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.   *Id.* §§ 404.1520(g), 416.920(g).   If a claimant is found to be disabled or

1  not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v.*

2  *Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

3  <center>**DISCUSSION**</center>

4  **A.      ALJ's Consideration of the Medical Evidence**

5       **1.      The ALJ's Consideration of Dr. Scaramozzino's Opinion**

6       Plaintiff asserts the ALJ erred in rejecting Dr. Scaramozzino's opinion as predicated only on

7  Plaintiff's subjective complaints.   (Doc. 13-1, 15:26-17:5.)   Moreover, in assessing Dr.

8  Scaramozzino's opinion, the ALJ erred by "inserting his own personal opinion as to what findings

9  need to be included in a psychological assessment to support limitations." (Doc. 13-1, 16:4-5.)

10  According to Plaintiff, because the ALJ rejected the opinions of the other non-examining physicians,

11  the ALJ's RFC assessment is "basically a layperson guess at limitations." (Doc. 13-1, 16:7.)

12       The Commissioner argues that the ALJ properly discounted Dr. Scaramozzino's conclusions

13  as inconsistent with his examination findings. (Doc. 14, 13:16-19.) Specifically, Dr. Scaramozzino

14  found that Plaintiff had normal concentration; judgment and insight; intellectual functioning and

15  reasoning skills; logical, concise speech and clear articulation; and intact abilities to calculate,

16  understand, and respond to simple commands.  (Doc. 14, 13:19-23.)  Yet, Dr. Scaramozzino

17  concluded that Plaintiff's concentration and attention abilities were fair to poor.

18       The ALJ found Dr. Scaramozzino's opinion to be less persuasive because his opinion as to

19  functioning was inconsistent with the findings made on examination, and his conclusions, therefore,

20  appeared predicated entirely on Plaintiff's subjective statements rather than his own observations.

21  (AR 90 ("[Dr.] Scaramozzino's opinion appears to be based entirely on the claimant's statements"),

22  92 ("[Dr.] Scaramozzino's report contains inconsistencies (Exhibit 3F), and therefore his opinion is

23  accordingly rendered less persuasive").)  These are legitimate and specific reasons to discount Dr.

24  Scaramozzino's opinions as to Plaintiff's level of functioning.

25       Plaintiff asserts that the ALJ "inserted his own personal opinion as to what findings need to

26  be included in a psychological assessment to support limitations." (Doc. 13-1, 16:4-5.)  This is not

27  a persuasive argument in light of the inconsistencies between Dr. Scarmozinno's findings and

28  conclusions.  The ALJ explained that Dr. Scaramozzino concluded that Plaintiff's symptom severity

<center>11</center>

is in the severe range, and opined that her ability to remember very short, simple or detailed instructions was fair to poor, and her ability to maintain concentration and attention was similarly fair to poor. Yet the ALJ noted that the findings made on examination do not support that degree of limitation. Specifically, the ALJ noted Dr. Scaramozzino's findings that Plaintiff's stream of mental activity and concentration was within normal limits, her thought content was appropriate, her recent and remote memory were intact, and she was able to calculate and perform a simple three-step command successfully. (AR 90.) Given these findings on examination, the ALJ determined that Dr. Scaramozzino's conclusions about Plaintiff's impaired ability to concentrate and perform simple tasks were inconsistent and unsupported.

Although Plaintiff argues it was error for the ALJ to reject the opinion because it did not contain findings that the ALJ deemed appropriate to support the conclusion, it is the function of the ALJ to weigh the evidence. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."). A rational interpretation of the evidence that is supported by substantial evidence must be upheld. *Id.* ("We must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation."). The ALJ's discussion of Dr. Scaramozzino's opinion and the ALJ's conclusion that the findings did not support the degree of the limitations opined is a rational interpretation of the discrepancy between the examination results and conclusions. Inconsistencies between the severity of findings on examination and the degree of limitation opined is a legally sufficient reason to give an opinion less weight. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ provided specific and legitimate reasons for rejecting treating doctor's opinion where it was inconsistent with examination notes as well as internally inconsistent and unsupported by findings made by treating doctor or any other doctor); *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (ALJ properly disregarded treating doctor's report where it varied from his treatment notes); *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (treating doctor's conclusory opinion that claimant was disabled properly rejected by ALJ as internally inconsistent as well as inconsistent with doctor's prior medical reports).

Further, because the findings did not support the limitations opined, the ALJ found that Dr. Scaramozzino's conclusions appeared to be based entirely on Plaintiff's lay statements, which the ALJ found not fully credible.  Unlike in *Ryan*, 528 F.3d at 1198, there are no independent findings included that support the limitation imposed, and Dr. Scaramozzino offered no explanation that, in his professional judgment, the limitations imposed were appropriate despite the seemingly mild examination findings.  As the ALJ noted, the specific tests of concentration and simple tasks that Dr. Scaramozzino administered during the examination yielded results that did not appear to support the degree of limitation opined.  Thus, even though Dr. Scaramozzino found Plaintiff generally credible, his conclusions appeared unsupported by his findings and indicated to the ALJ that Dr. Scaramozzino merely accepted Plaintiff's lay statements in forming his conclusions, which, as discussed below, the ALJ provided sufficient reasons to discount.  This is an acceptable reason, in conjunction with the inconsistencies in the opinion, to give Dr. Scaramozzino's conclusions about Plaintiff's functioning less weight.  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) ("As the ALJ determined that [the claimant's] description of her limitations was not entirely credible, it is reasonable to discount a physician's prescription that was based on those less than credible statements.").

### 2.   The Opinions of Drs. Garcia and Murillo Do Not Constitute Substantial Evidence

Plaintiff contends there is no medical evidence in the record that supports the ALJ's findings that Plaintiff's mental condition is not disabling.  Specifically, Plaintiff contends that the ALJ discredited the opinions of the state-agency non-examining physicians, and Mr. Ruiz' opinion does not support the proposition that Plaintiff is not disabled.  Therefore, the ALJ's conclusion is based on nothing more than "a layperson guess at limitations."  (Doc. 15, 6:19-21.)

Although Plaintiff contends that the opinions of the non-examining state-agency physicians were rejected by the ALJ, the ALJ gave "significant weight" to the opinions of Drs. Garcia and Murillo.  (AR 91.)  While the ALJ did not credit Dr. Garcia's finding that Plaintiff was only mildly limited in the areas of social functioning and concentration, persistence, or pace, Dr. Garcia's opinion was not completely disregarded as Plaintiff's argument implies.  However, the opinions of Drs.

Garcia and Murillo are those of non-examining physicians. These opinions do not constitute substantial evidence, unless they are supported by other evidence of record and are consistent with it. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) ("[W]hen it is an *examining* physician's opinion that the ALJ has rejected in reliance on the testimony of a nonexamining advisor, reports of the nonexamining advisor need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it."). While the ALJ determined that the opinion of Dr. Garcia is "fully supported by the medical evidence and is consistent with the record as a whole," the ALJ provided no citation to or discussion of the evidence in the record to support this conclusion. The ALJ noted that some weight was given to the opinion of Mr. Ruiz, Plaintiff's therapist who reported that Plaintiff's "condition is improving as of late but with this disorder, it is too soon to know how she will do over the long run." (AR 580.) Mr. Ruiz' statement is entirely equivocal, and says nothing about Plaintiff's functional limitations. It does not, therefore, provide any reasoned support for the non-examining physicians' conclusions that Plaintiff can perform simple, repetitive tasks.

Additionally, some of Plaintiff's statements regarding her functional limitations appeared to have been credited by the ALJ in rejecting Dr. Garcia and Dr. Murillo's opinion that Plaintiff was only mildly limited in the areas of social functioning and in the area of concentration, persistence, or pace. (AR 87, 91.) Specifically, unlike the opinions of Drs. Garcia and Murillo, the ALJ determined that Plaintiff had moderate difficulties in both these areas. (AR 87.) In concluding that Plaintiff had moderate limitations in these areas, the ALJ appeared to rely on Plaintiff's lay statements, and credited them to this degree. Thus, Plaintiff's lay statements that the ALJ credited do not necessarily support Drs. Garcia and Murillo's opinion about Plaintiff's degree of functioning nor are they fully consistent with the non-examining physicians' findings. Because the opinion of Drs. Garcia and Murillo about Plaintiff's mental functioning abilities are not supported by other evidence in the record, they do not constitute substantial evidence. *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990) ("nonexamining physicians' conclusion, with nothing more, does not constitute substantial evidence").

Moreover, both the opinions of Drs. Garcia and Murillo are merely a set of conclusions, with no stated reasoning, and they were not based on any independent findings. Even though these opinions varied considerably from Dr. Scaramozzino's findings, neither Dr. Garcia nor Dr. Murillo specifically addressed why their impressions differed from Dr. Scaramozzino. Dr. Garcia noted that Dr. Scaramozzino's opinion appeared "overly restrictive given the totality of evidence," but no discussion followed. (AR 266.) Moreover, the ALJ refused to *fully* credit these opinions in assessing the severity of Plaintiff's mental limitations. As such, the ALJ's reliance on these opinions alone in concluding Plaintiff retained the ability to perform simple, repetitive work is misplaced, and, in this regard, the decision is not supported with substantial evidence. *Pitzer*, 908 F.2d at 506 n.4.

### 3.    Dr. Baluyot's Opinion

Plaintiff asserts that Dr. Baluyot's opinion was improperly disregarded. Specifically, Plaintiff contends that Dr. Baluyot's note requesting that Plaintiff's son be moved to a closer prison due to Plaintiff's health problems was not considered by the ALJ as an opinion on Plaintiff's level of functioning. (Doc. 13-1, 15:13-25.) In the note, Dr. Baluyot indicated that a three-hour trip to see Plaintiff's son would be too difficult for Plaintiff to undertake. Dr. Baluyot's observation that Plaintiff could not be sedentary in a car for up to three hours to travel to see her son was given no express consideration but was clearly disregarded because the ALJ concluded that Plaintiff could perform all sedentary work without the need to alternate positions. According to Plaintiff, the ALJ erred by failing to discuss this evidence from Dr. Baluyot. (Doc. 13-1, 15:13-25.)

The Commissioner contends that Dr. Baluyot's note to which Plaintiff refers is not a medical opinion. (Doc. 14, 12:18-25.) Rather, it was "presumably written to assist Plaintiff in requesting that her son be moved to a prison closer to home." (Doc. 14, 12:26-27.) Even assuming this was a medical opinion, the note does not include any specific limitations and says nothing about work-related restrictions, but indicates that Dr. Baluyot felt that Plaintiff was disabled. (Doc. 14, 12:27-13:2.) The medical evidence, particularly Dr. Levin's opinion to which the ALJ ascribed weight, indicated that Plaintiff was not limited to the degree she alleged.

Plaintiff responds that, even though Dr. Baluyot's note did not provide extended details as to functioning, "it did provide a very important opinion – Ms. Hill could not tolerate traveling (which

1  would mean sitting) for several hours at a time." (Doc. 15, 5:23-25.)  Plaintiff contends that the ALJ

2  should have addressed the opinion and explained why it was not credited.

3      Pursuant to Ninth Circuit precedent, the ALJ is required to provide "clear and convincing"

4  reasons for rejecting the uncontroverted opinion of either a treating or examining physician or

5  psychologist. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  Even where a treating or

6  examining physician's opinion is contradicted, it may "only be rejected for specific and legitimate

7  reasons that are supported by substantial evidence in the record." *Id.* at 830-31.  The ALJ can

8  accomplish this by "setting out a detailed and thorough summary of the facts and conflicting clinical

9  evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d at

10  725.  However, the ALJ "need not discuss *all* evidence presented." *Vincent v. Heckler*, 739 F.2d

11  1393, 1394-95 (9th Cir. 1984) (per curiam).  The ALJ must only explain why "significant probative

12  evidence has been rejected." *Id.*

13      On April 21, 2009, Dr. Baluyot wrote a letter stating that Plaintiff "suffers from multiple

14  health problems and can't tolerate traveling for several hours to visit her son in jail." (AR 431.)  To

15  the extent that Dr. Baluyot's note can be considered a type of medical opinion, it is not significant

16  or probative of Plaintiff's level of functioning.  While Plaintiff asserts that Dr. Baluyot's opinion is

17  indicative of Plaintiff's ability to sit for extended periods of time, this is only conjecture about what

18  Dr. Baluyot meant by stating that Plaintiff could not tolerate traveling for several hours.[11]  There are

19  any number of reasons why traveling in a car for three hours may be too difficult for Plaintiff, several

20  of which have no relevance to Plaintiff's ability to perform work-related activities at the sedentary,

21  unskilled level.  The note itself provides no insight into why Plaintiff struggles while traveling for

22  several hours – i.e., whether it is the lack of readily accessible bathroom facilities (related to

23  Plaintiff's IBS (*see* AR 107)), the inability to maintain foot controls while driving due to Plaintiff's

24  polyneuropathy and/or restless leg syndrome, or the inability to sit for long periods of time.  The note

25  simply contains insufficient detail to be considered probative or significant evidence that the ALJ

26

27 _____

28      [11] Plaintiff's argument is built on an assumption about the letter, which, in turn, amplifies the letter's ambiguity
– on its face, the letter says nothing specific about Plaintiff's functioning.

should have expressly considered because it does not discuss *what* it is about Plaintiff's medical conditions that makes it difficult for her to travel, or the precise nature of the difficulties.

Because this note is not significant, probative evidence of Plaintiff's functional abilities, the ALJ's failure to consider it was not error. *Vincent*, 739 F.3d at 1394-95. However, as this case will be remanded so that the ALJ may give further consideration to Plaintiff's mental functioning, Plaintiff is free to supplement the record with further evidence from Dr. Baluyot to provide meaning to an otherwise cryptic note.

**B.    The ALJ's Consideration of Plaintiff's Insomnia**

Plaintiff argues that she has reported difficulty sleeping multiple times to her treating and examining physicians; while Plaintiff has not been formally diagnosed with sleep apnea, she has been diagnosed with insomnia which the ALJ failed to consider. (Doc. 13-1, 13:3-15:2.)

The Commissioner asserts that, whatever the underlying cause of Plaintiff's fatigue and sleep issues, her symptom testimony was considered by the ALJ and rejected for legally sufficient reasons. Because the ALJ considered Plaintiff's symptom testimony in this regard, the ALJ did not fail to account for Plaintiff's insomnia and fatigue. (Doc. 14, 8:23-12:16.)

In the reply brief, Plaintiff responds that the ALJ rejected all of Plaintiff's statements about her insomnia and sleep issues because the ALJ refused to find Plaintiff's sleep apnea a medically determinable condition. Plaintiff contends that, because insomnia is a different condition from sleep apnea, the ALJ was required to give consideration to the limitations resulting from her medically determinable insomnia condition. Plaintiff also contends that, implicit in the argument with regard to the ALJ's consideration of her insomnia, is a challenge to the ALJ's credibility determination because the "ALJ could not adequately analyze [Plaintiff's] credibility since [s]he never explained why [s]he was not crediting her diagnosis of insomnia." (Doc. 15, 5:3-4.)

On several occasions, Plaintiff reported to Dr. Baluyot difficulty sleeping and was treated for symptoms of insomnia (*see* AR 242, 304, 314, 320, 430), but Plaintiff points to no formal diagnosis

for insomnia.[12]   However, insomnia was also considered as one the symptoms of Plaintiff's bipolar

disorder, which was determined to be severe by the ALJ.   Plaintiff's testimony in this regard was

discussed by the ALJ.   Thus, regardless of whether Plaintiff's insomnia is an independent severe

condition in and of itself, the ALJ's decision reflects consideration of Plaintiff's testimony regarding

her sleeping problems and resulting fatigue.   For example, Plaintiff explained to Dr. Scaramozzino

that she suffers episodes where she does not need sleep for two to three days at a time, and then she

becomes withdrawn and isolated due to depression and exhaustion.  (AR 241.)  She also indicated

she is easily fatigued and depressed countered by episodes of "being up" and not needing any sleep

and cleaning the house for two to three days at a time.  (AR 241.)  Dr. Scaramozzino discussed

Plaintiff's sleeping patterns as part of her bipolar diagnosis (AR 241 (chief complaint that Plaintiff

was fatigued, depressed most of the day countered by episodes of being up, not needing any sleep,

cleaning the house for two to three days at a time)), a diagnosis which the ALJ credited (AR 86

(finding bipolar disease both medically determinable and a severe impairment).)  Thus, the decision

reflects consideration of  Plaintiff's insomnia, particularly as a symptom of her bipolar disorder.

The ALJ considered Plaintiff's statements that her ability to concentrate is hampered by

depression and fatigue.  (AR 87.)  However, beyond the moderate difficulties noted in concentration,

persistence or pace, the ALJ gave Plaintiff's lay statements little probative weight.  (AR 92.)  For

example, the ALJ considered Plaintiff's testimony that she experiences episodes where she sweats

and then experiences a strong urge to lie down during the day.  (AR 89.)  However, the ALJ

determined that Plaintiff's statement in this regard was not particularly credible.  (AR 91.)  Plaintiff

testified at the hearing that she has always sought medical treatment for these episodes (AR 109),

yet, the ALJ noted there was no evidence of such medical treatment in the record, and therefore

assigned Plaintiff's statements in this regard less weight.  (AR 91.)

In further consideration of Plaintiff's lay statements and testimony, the ALJ concluded that

her statements were less probative due to several inconsistencies.  (AR 92.)  For example, the ALJ

---

[12]  Dr. Baluyot noted insomnia at page 430 of the record, but this was identified as a list of "indications/diagnoses" for which Plaintiff was taking medication.  It is does not indicate that Plaintiff had a formal diagnosis for insomnia or whether Plaintiff was reporting symptoms of insomnia for which Ambien was prescribed.

noted (AR 91) that while Plaintiff stated in her disability application that she had stopped work on August 3, 1993 (AR 166), she told Dr. Scaramozzino that she had not been able to work outside the home since 1991 (AR 243).  She also told Dr. Scaramozzino that she had volunteered for "everything and did all kinds of activities and volunteer work up until 2002" (AR 243), which was inconsistent with her allegation that she was not able to do any work outside the home.  (AR 92.)  Inconsistencies or internal conflicts in Plaintiff's statements is a clear and convincing reason to give less weight to those statements.  *See Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), *as amended on September 17, 1997* (in weighing plaintiff's credibility, the ALJ may consider "inconsistencies either in [plaintiff's] testimony or between his testimony and his conduct"); *see also Fair v. Bowen*, 885 F.2d 597, 604 n.5 (9th Cir. 1989) (an ALJ can reject pain testimony based on contradictions in plaintiff's testimony).

The ALJ also permissibly considered Plaintiff's work history as part of the credibility analysis and found that Plaintiff had only worked one day in 1990 and had never worked a day since then. (AR 92.)  The ALJ reasoned that this showed poor motivation to do work, and raised a question as to whether Plaintiff's current unemployment was truly the result of medical problems.  (AR 92.)  This is a legally sufficient reason to discredit Plaintiff's testimony.  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (claimant with an extremely poor work history and showing little propensity to work in her lifetime is an appropriate credibility consideration).

In light of the foregoing, the ALJ's decision reflects consideration of Plaintiff's insomnia, even though it was not determined to be an independent medically determinable impairment. Plaintiff's lay testimony about her fatigue and sleeping difficulties was considered, particularly in conjunction with her bipolar disorder.  Further, to the extent that Plaintiff testified to limitations more severe than those determined by the ALJ to be credible, the ALJ provided legally sufficient reasons to discredit those statements.  However, as a remand is warranted for further consideration of Plaintiff's mental limitations, Plaintiff may submit additional evidence regarding her insomnia which the ALJ may consider on remand.

1   **C.      Evidence Submitted by Plaintiff for the First Time to the Appeals Council**

2          Plaintiff contends that evidence newly submitted to the Appeals Council establishes a

3   reasonable possibility of changing the outcome of the case, and the case should be remanded for the

4   ALJ to consider this new and material evidence. (Doc. 13-1,17:12-18:6.)  The evidence Plaintiff

5   contends must be considered is a November 4, 2009, letter from Dr. Levin to Dr. Baluyot regarding

6   Plaintiff's polyneuropathy and the resulting symptomatology.  (AR 581.)

7          The Commissioner asserts that Plaintiff has not made the requisite good cause showing for

8   submitting evidence obtained after the ALJ rendered the decision.  Moreover, the Commissioner

9   contends that Dr. Levin's letter is not material because it provides no detail about specific limitations

10  in Plaintiff's ability to perform daily activities. (Doc. 14, 14:9-15:28.)

11         Pursuant to 20 C.F.R. § 416.1470(b), evidence submitted for the first time to the Appeals

12  Council must be considered as follows:

13          [I]f new and material evidence is submitted, the Appeals Council shall consider the
            additional evidence only where it relates to the period on or before the date the
14          administrative law judge hearing decision . . . It will then review the case if it finds
            that the administrative law judge's actions, findings, or conclusion is contrary to the
15          weight of the evidence currently of record.

16  After the parties filed their briefs in this matter, the Ninth Circuit issued a decision holding that

17  where a claimant submits evidence for the first time to the Appeals Council, which is in turn

18  considered by the Appeals Council in denying review of the ALJ's decision, the new evidence must

19  be treated as part of the administrative record. *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d

20  1157, 1161-62 (9th Cir. 2012).  As such, the district court is obligated to consider that evidence in

21  determining whether the ALJ's decision is supported by substantial evidence. *Id.*  The *Brewes* court

22  clarified that claimants are not required to show "good cause" before submitting new evidence to the

23  Appeals Council.  Nor is a claimant required to establish that the new evidence is material to trigger

24  the district court's obligation to consider it where it has already become part of the record by virtue

25  of the Appeals Council's review of the evidence.  *Id.* at 1164.  Rather, when the Appeals Council

26  accepts a claimant's proffer of new evidence and makes it part of the record, it is essentially

27  concluding that the evidence is material within the meaning of 20 C.F.R. § 404.970(b).  *Id.*

28

1   In considering a claimant's evidence submitted for the first time to the Appeals Council,

2   district courts must assess the record as a whole and determine whether the ALJ's decision is

3   supported by substantial evidence. *Id.* at 1161-62. Here, in seeking review of the ALJ's decision

4   before the Appeals Council, Plaintiff submitted a letter from Dr. Levin written on November 4, 2009,

5   drafted and submitted subsequent to the ALJ's October 23, 2009, decision. (AR 579.) The Appeals

6   Council considered the evidence (AR 41), ordered that it be included in the administrative record

7   (AR 44), but concluded that it did not warrant review of the ALJ's decision (*see* AR 41-42 ("In

8   looking at your case, we considered the additional evidence listed on the enclosed Order of Appeals

9   Council. We found that this information does not provide a basis for changing the Administrative

10  Law Judge's decision.").) Thus, the Appeals Council denied review of the ALJ's October 23, 2009,

11  decision. (AR 41.) Plaintiff contends that Dr. Levin's November 4, 2009, letter could potentially

12  support a change in the ALJ's disability determination if it were considered by the ALJ, and argues

13  that the Court should remand the matter so that the ALJ can consider it.

14      In weighing Dr. Levin's May 7, 2009, opinion, the ALJ ascribed it significant probative value

15  as the most recent medical evidence from a treating specialist, but found that it did not establish that

16  Plaintiff's impairments were disabling in several respects:

17      The claimant was referred to neurologist Dr. Jeffrey Levin for further evaluation for
        neuropathic symptoms stemming from diabetes (Exhibit 16F). Dr. Levin's report,
18      which is the most recent medical record, indicates that the claimant's condition is not
        as serious as she alleged. *Id.* In neuropathy to light touch, vibration and pinprick,"
19      with "decreased recruitment" seen throughout her extremities and "denervation in the
        abductor policis brevis bilaterally" (Exhibit 16F/1). He also noted that "she appears
20      to have more prominent axonal changes and demyelination," however this finding
        was not fully confirmed (Id.) Moreover, he also observed that she had no pain with
21      straight leg raising in the lower extremities, her plantar responses were flexor and she
        was "able to heel, toe, and tandem gait without difficulties." He diagnosed her with
22      mild polyneuropathy, which he noted as probably diabetes-related (Exhibit 16F/1-2)
        but did not indicate that her condition would prevent her from using her hands or
23      would cause any limitations in her ability to perform basic work activities.

24  (AR 90.)

25      On November 4, 2009, Dr. Levin sent a letter to Dr. Baluyot regarding Plaintiff's condition:

26      Ms. Hill has been followed by myself prior to this on 05/07/09. She has been
        diagnosed with diabetic polyneuropathy. She appears to have a progression of her
27      symptomatologies. She has severe pain, burning dysesthesias, and dysautonomia.
        She is treating with Dr. James Kraus and receiving numerous medications to treat her
28      pain and dysesthesias. Recently over the last few months she has also been treated

1    for restless legs symptomatology, same as patients with progressive diabetic
2    neuropathy.  It appears that the treatment for neuropathy is somewhat disabling for
     her [and] inhibits her from completing her activities of daily living on her own.

3    (AR 581.)

4         With regard to Plaintiff's functional abilities, Dr. Levin's November 4, 2009, letter lacks the

5    same level of detail as Dr. Baluyot's April 21, 2009, note that Plaintiff "suffers from multiple health

6    problems and can't tolerate traveling for several hours"(AR 431) and Mr. Ruiz' equivocal letter that

7    Plaintiff was "improving of late" (AR 580).  While Dr. Levin indicates that Plaintiff "appears to have

8    a progression of her symptomatologies," it is unclear how Plaintiff's condition has worsened such

9    that she is precluded from working.  Dr. Levin notes that Plaintiff's treatment for neuropathy "is

10   somewhat disabling for her," but does not indicate how she is limited in her ability to complete

11   activities of daily living or what the term "somewhat" means in the context of Plaintiff's functioning.

12   At best, Dr. Levin's letter appears to indicate that Plaintiff is reporting worse symptoms than those

13   she previously reported, and these symptoms render her "somewhat disabled" in an equivocal and

14   unqualified sense.  Considered in the context of the entire record, this evidence does not tend to

15   undercut Dr. Levin's May 7, 2009, opinion, the substantial evidence supporting the ALJ's finding

16   with regard to the limiting effects of Plaintiff's polyneuropathy impairment.  While the November

17   4, 2009, letter has relevance to Plaintiff's polyneuropathy and must be considered (i.e., it is material

18   to the extent that the Appeals Council included it in the record), its materiality does not rise to a

19   degree of probative value that, in light of it, substantial evidence no longer supports the ALJ's finding

20   with regard to Plaintiff's condition supporting a remand.[13]

21

22       [13] In *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001) the court considered whether new evidence
     submitted to the Appeals Council for the first time warranted remand to the ALJ.  In affirming the district court's refusal
23   to remand the matter in light of the new evidence, the *Mayes* court instructed that, "[t]o justify a remand, [the claimant]
     must show that the [new evidence] is material to determining her disability, and that she had good cause for having failed
24   to produce that evidence earlier."  In *Brewes*, the court considered whether new evidence submitted for the first time to
     the Appeals Council may be rejected by the district court without review of the evidence.  The *Brewes* court held that
25   once the Appeals Council considers the evidence, a district court must review it and determine whether the ALJ's decision
     is supported by substantial evidence in light of the new evidence.  *Brewes*, 682 F.3d at 1163.  In doing so, the court
26   rejected the Commissioner's argument that the evidence was not material, holding that once the Appeals Council has
     considered and admitted the evidence into the record, it is "apparently concluding that [the evidence] was material within
27   the meaning of 20 C.F.R. § 404.970(b)."  *Id*. at 1164.  As both *Brewes* and *Mayes* are published three-judge panel
     decisions, *Brewes* cannot be said to have overruled *Mayes*.  *See Old Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir.
28   2002) ("we have no discretion to depart from precedential aspects of our prior decision . . . under the general law-of-the-
     circuit rule").  Thus, the Court has attempted to apply these cases in concert.

1    However, as this matter must be remanded for further consideration of Plaintiff's mental

2    limitations, the ALJ will have an opportunity to review this evidence and again consider the degree

3    of functional limitation Plaintiff suffers as a result of her polyneuropathy.  The ALJ should consider

4    whether the evidence is ambiguous as to Plaintiff's limitations arising from her polyneuropathy

5    impairment such that additional evidence or further clarification is necessary.  *See Smolen v. Chater*,

6    80 F.3d 1152, 1158 (9th Cir. 2001), *as amended* August 9, 2001 (ALJ has a duty to develop the

7    record if the basis of a doctor's opinion is necessary to evaluate it).

8    **D.    The ALJ's Hypothetical Question to the Vocational Expert**

9    At the Fifth Step of the sequential analysis, the burden shifts to the Commissioner to establish

10   that the claimant is not disabled and can engage in work that exists in significant numbers in the

11   national economy.  20 C.F.R. § 416.920(a)(4)(v); *Hill v. Astrue*, __ F.3d __, 2012 WL 3185576, at

12   *7 (9th Cir. Aug. 7, 2012).  This burden can be satisfied by posing a hypothetical question to a

13   vocational expert based on medical assumptions supported by substantial evidence in the record and

14   reflecting all the claimant's limitations, both physical and mental.  *See Valentine v. Comm'r of Soc.*

15   *Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  "If a vocational expert's hypothetical does not reflect

16   all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding

17   that the claimant can perform jobs in the national economy."  *Matthews v. Shalala*, 10 F.3d 678, 681

18   (9th Cir. 1993) (internal quotation marks and citation omitted).

19   Plaintiff argues that, while the ALJ concluded that Plaintiff had moderate limitations in

20   concentration and social functioning, these limitations were not included in the hypothetical posed

21   to the VE.  (Doc. 13-1, 10:22-27.)  Plaintiff also contends that the ALJ's decision with respect to

22   Plaintiff's social limitation is internally inconsistent.  (Doc. 13-1, 11:18-19.)  Specifically, Plaintiff

23   notes that the ALJ found that Plaintiff suffers from moderate limitations in social functioning but

24   does not include any social functioning limitation in the RFC or the hypothetical question.

25   Moreover, even to the degree the ALJ's conclusion that Plaintiff retains the ability to perform simple,

26   repetitive tasks captures moderate limitations in social functioning, the limitation to simple,

27   repetitive tasks was also not included in the ALJ's hypothetical.  Rather, the only limitation posed

28   by the ALJ to the VE included a limitation to "sedentary work."

1    The Commissioner concedes that failing to pose the limitation for simple, repetitive tasks

2    (which was a limitation set out in the ALJ's RFC assessment) to the VE was error on the part of the

3    ALJ, but the error was rendered harmless because the VE nonetheless testified to jobs that are

4    unskilled and, by definition, are limited to simple, repetitive tasks.  (Doc. 14, 6:16-8:21.)

5        In light of the fact that this case must be remanded for further consideration of the medical

6    evidence, the Court cannot conclude whether the conceded error in this regard was harmless.  After

7    further consideration or clarification of the medical evidence, the ALJ may reach a different

8    conclusion as to Plaintiff's mental or physical limitations for which the ALJ will be required to pose

9    a new hypothetical to the VE. *Russell v. Sullivan*, 930 F.2d 1443, 1445 (9th Cir. 1991) (hypothetical

10   questions posed to a VE must "set out *all* the limitations and restricts of the particular claimant").

11   **E.    Remand is Appropriate**

12       "The court shall have power to enter, upon the pleadings and transcript of the record, a

13   judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

14   with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  In Social Security cases,

15   the decision to remand to the Commissioner for further proceedings or simply to award benefits is

16   within the discretion of the court. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  "If

17   additional proceedings can remedy defects in the original administrative proceedings, a social

18   security case should be remanded.  Where, however, a rehearing would simply delay receipt of

19   benefits, reversal [and an award of benefits] is appropriate." *Id.* (alteration in original) (internal

20   quotation marks omitted).

21       The Court finds that remand for further proceedings is appropriate so that the ALJ can

22   undertake renewed consideration of the medical evidence, particularly the evidence related to

23   Plaintiff's mental impairment.  The ALJ will also have an opportunity to consider the new evidence

24   presented by Plaintiff and determine whether any additional evidence must be obtained.

25                                   **<ins>CONCLUSION</ins>**

26       Based on the foregoing, the Court finds that the ALJ's decision is not supported by

27   substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for further

28   proceedings consistent with this order.  The Clerk of this Court is DIRECTED to enter judgment in

favor of Plaintiff Laura Jean Hill and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

Dated:    September 17, 2012                          /s/ Sheila K. Oberto
                                                       UNITED STATES MAGISTRATE JUDGE